NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1880
_____

UNITED STATES OF AMERICA

v.

FAREED RAY,
Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Crim. No. 1-12-cr-00058-002)
Chief District Judge: Honorable Christopher C. Conner
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 10, 2017
_____

Before: GREENAWAY, JR., SHWARTZ, and RENDELL, *Circuit Judges*.

(Opinion Filed: August 21, 2017)

_____

OPINION[*]
_____

GREENAWAY, JR., *Circuit Judge*.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Fareed Ray argues on appeal that we should reverse the District Court's denial of his motion to suppress evidence obtained after his arrest. He contends that law enforcement officers did not have probable cause to arrest him for attempted delivery of a controlled substance. Contrary to Ray's argument, the facts indicate that the officers had probable cause to arrest Ray and therefore lawfully obtained evidence from the search incident to his arrest. We will affirm.

## I.     Facts and Procedural Background

On February 2, 2012, Trooper Justin Gardner arrested Michael Bobb after a traffic stop in Perry County, Pennsylvania. During the traffic stop, Trooper Gardner found that Bobb was wanted for a parole violation and subsequently detained Bobb while he ascertained whether the warrant for the violation was legitimate. Thereafter, Trooper Gardner called Bobb's mother, the vehicle's owner, and received her permission to legally search the vehicle. Upon searching the vehicle, he found two loaded revolvers in the back passenger seat and a makeshift foil pipe and a glass smoking pipe next to the driver's seat. Trooper Gardner then placed Bobb under arrest, Mirandized him, and took him to the Perry County Courthouse for arraignment. Bobb stated his willingness to cooperate with law enforcement, so Trooper Gardner contacted Trooper Jon Mearkle from the state police's vice and narcotics unit to interview Bobb. Thereafter, Trooper Mearkle and Trooper Scott Fidler met Trooper Gardner at the Perry County Courthouse to interview Bobb.

2

During his interview with the troopers, Bobb admitted that he was en route to Harrisburg, Pennsylvania, in order to trade the two guns for drugs with an individual named "Diego." Bobb stated that this guns-for-drugs relationship had been ongoing for a couple of months. Bobb was willing to work with law enforcement to identify "Diego" and to arrange a guns-for-drugs transaction with him. As part of his cooperation, Bobb gave Trooper Mearkle a cell phone number linked to "Diego" and called that number in the troopers' presence. The troopers did not record the phone call and could hear only Bobb's half of the conversation. During the conversation, Bobb arranged to purchase two bundles of heroin and two eight balls of cocaine in exchange for a firearm. This conversation was consistent with what Bobb had told the troopers about his relationship with "Diego." After this initial call, the troopers contacted other law enforcement officials to determine "Diego's" identity and learned that "Diego" was Ray's alias. Following their inquiry, Trooper Fidler received a photograph of Ray on his cell phone from a law enforcement database. When the troopers showed Bobb the photograph, he identified Ray as "Diego."

Following the identification, Trooper Mearkle contacted the Drug Enforcement Agency ("DEA") and was given authorization to record future calls with "Diego" because of the possibility that he could be the target of a federal investigation. Trooper Mearkle placed a recording device on Bobb's phone but mistakenly plugged the device into the microphone jack instead of the audio jack.

Bobb called "Diego" at 5:17 p.m. from Trooper Mearkle's vehicle and said that he would meet "Diego" at a Burger King in Harrisburg at Cameron Street and Maclay Street. However, because of Trooper Mearkle's error, the recording device captured only Bobb's side of the conversation. During the call, Trooper Mearkle heard Bobb change the arrangement from two bundles of heroin, two eight balls of cocaine, and a firearm to three bundles of heroin, three eight balls of cocaine, and a different firearm. Trooper Mearkle also heard Bobb tell "Diego" that he wanted to trade a firearm similar to one that he had given him in the past.

With the information gathered from Bobb, Trooper Mearkle established a surveillance team at the Burger King and planned to arrest Ray after the transaction. At 5:30 p.m., Bobb called "Diego" again at the same phone number and told him that he was at the Burger King and that he was going inside for food. "Diego" called Bobb back about three minutes later and told Bobb to meet him outside of the Burger King. These conversations were not recorded.

During these conversations, Trooper Fidler was surveilling the Burger King. Trooper Fidler observed a grey/silver Honda pull into the Burger King, and he identified Ray as the rear passenger.[1] Trooper Fidler saw the vehicle stop in the Burger King parking lot and then leave. Several officers followed the vehicle but lost surveillance of it for a minute or two.

---

[1] The Honda was alternatively referred to as grey and as silver at the suppression hearing.

At 5:49 p.m., "Diego" called Bobb again from the same number and changed the location of the meet-up, telling Bobb that the current location was "too hot." App. 110. This conversation was also unrecorded. After "Diego" told Bobb to remain on the phone, Trooper Mearkle exited the vehicle and called Trooper Fidler to inform him of the location change. When Trooper Mearkle re-entered the vehicle, Bobb told the trooper that "Diego" wanted to speak with him. Trooper Mearkle took the phone from Bobb and ended the call without speaking.

Trooper Fidler arrived at an area near the new location and observed the same grey/silver Honda three blocks away from where "Diego" said he would be. This location overlooked the new location and provided a good vantage point for countersurveillance. Trooper Fidler identified the Honda as the same one that had left the Burger King parking lot and again identified Ray in the backseat of the car. Following this identification, Trooper Fidler arrested and Mirandized Ray for attempt to deliver a controlled substance. Trooper Fidler searched Ray incident to the arrest and found a small amount of marijuana and cash. He also recovered Ray's cell phone from the floorboard where he was sitting. Trooper Mearkle called the number linked to "Diego" and the call rang Ray's cell phone. Trooper Fidler received the driver's consent to search the vehicle and found a half ounce of cocaine in the center console. Consequently, the troopers arrested the two other occupants of the Honda. The arrestees were subsequently transported to processing where Ray was strip searched and found to have crack cocaine on his person.

5

On February 29, 2012, a grand jury indicted Ray and four others, and a superseding indictment was filed on February 20, 2013.  Ray pleaded not guilty on all counts.  On January 13, 2014, Ray filed the motion to suppress at issue in this appeal, which the District Court denied.  After trial, the jury found Ray guilty on all counts of the superseding indictment.[2]  Ray was sentenced to 248 months in prison.  This timely appeal followed.

## II.  Analysis[3]

On appeal, Ray argues that the District Court erred in finding that the troopers had probable cause to arrest Ray for attempted delivery of a controlled substance because it was based on Bobb's unreliable claims.  He contends that the troopers made no attempts to corroborate Bobb's information, and thus their reliance on the information was unreasonable.  Ray also asserts that his arrival at the Burger King and his presence near the second meeting location were not sufficient to establish probable cause to arrest.  These arguments are without merit.

"Where a motion to suppress has been denied, we review the order for clear error as to the underlying facts, but exercise plenary review as to its legality in the light of the court's properly found facts."  *United States v. Davis*, 726 F.3d 434, 439 (3d Cir. 2013)

---

[2] Count 3 of the indictment was dismissed on a Government motion at sentencing.
[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

(internal quotation marks omitted). "We construe the record in the light most favorable to the government." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002).

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause is determined by the totality of the circumstances." *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002) (internal quotation marks omitted). An informant's veracity, reliability, and basis of knowledge are "relevant considerations" in the totality of the circumstances analysis. *Illinois v. Gates*, 462 U.S. 213, 233 (1983). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. Indeed, "[p]robable cause exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested." *United States v. Laville*, 480 F.3d 187, 194 (3d Cir. 2007). Under the collective knowledge doctrine, information known to any one officer is imputed to the other officers in a joint operation. *See United States v. Belle*, 593 F.2d 487, 497 n.15 (3d Cir. 1979).

The District Court found several reasons that established probable cause to arrest Ray for attempted delivery of a controlled substance: the information from Bobb that "Diego" was trafficking controlled substances; the confirmation of "Diego's" identity

7

through law enforcement networks and databases; Bobb's physical identification of "Diego" as Ray; the multiple conversations that Bobb had with "Diego" about the transaction and past transactions; and the surveillance of the Burger King. *United States v. Ray*, No. 1-12-cr-00058-002, 2014 WL 1405043, at *4 (M.D. Pa. Apr. 10, 2014). Additionally, the District Court refuted Ray's attack on Bobb's reliability by concluding that Ray's actions, as surveilled, "were entirely consistent" with the information and conversations that Bobb provided to law enforcement. *Id.*

We agree with the District Court's conclusions. Bobb's conversations with Ray, in conjunction with the activity observed during the troopers' surveillance, would "warrant a person of reasonable caution to conclude that an offense . . . [was] being committed" by Ray. *Laville*, 480 F.3d at 194. Bobb set up the guns-for-drugs transaction with "Diego" in Trooper Mearkle's presence and referred to similar past transactions. Subsequently, Bobb identified "Diego" as Ray from a photograph Trooper Fidler obtained from a law enforcement database. Trooper Fidler verified Ray's arrival in a grey/silver Honda at the Burger King chosen for the drug deal.

After the vehicle left the Burger King, "Diego" called Bobb to change the location of their meet-up and told him the current location was "too hot." App. 110. Based on their experience, the troopers understood "too hot" to mean that Ray had either noticed their surveillance or that he had conducted countersurveillance in the area. Trooper Fidler arrived at an area near the new location and observed the same Honda in an area that overlooked the new location. From Trooper Fidler's experience, the new location

8

provided a good vantage point for Ray and the other passengers in the Honda to conduct countersurveillance. Thus, the troopers could reasonably assume that Ray entered the Burger King to engage in the intended drug deal, consistent with Bobb's conversation, and left the Burger King to do so outside of the presence of law enforcement.

Despite the facts giving rise to probable cause, Ray contends that *United States v. Myers*, 308 F.3d 251 (3d Cir. 2002)—where we found the police responding to a domestic dispute lacked probable cause to arrest the defendant for simple assault, domestic abuse, or possession of an unlicensed firearm—controls our decision. In that case, we concluded that the arresting officer's testimony did not elicit a belief that the domestic dispute to which he responded involved a crime of simple assault or domestic abuse. *See Myers*, 308 F.3d at 256, 261–62. Furthermore, we found that the officer did not testify to any reasonable belief that he was arresting the defendant in his own home— a lack of knowledge "fatal to the reasonableness of the warrantless arrest for a [Violation of the Uniform Firearms Act] charge." *Id.* at 263.

In contrast, the facts before us show that the troopers testified to a belief that Ray was attempting to deliver a controlled substance. Trooper Mearkle heard Bobb arrange a drugs-for-guns transaction with "Diego"; he also heard Bobb discuss a similar past transaction. The troopers identified "Diego" as Ray through law enforcement networks, and Bobb provided a physical identification. Furthermore, the troopers identified Ray as he entered the Burger King parking lot chosen for the drug deal and testified that his movements corresponded with his change of location. Thus, in contrast to the arresting

9

officer in *Myers*, the troopers had reason to believe that Ray was engaged in an attempted drug deal. As such, the totality of the information that law enforcement had from Bobb, and what they confirmed with their surveillance, established probable cause to arrest Ray.[4]

III.    Conclusion

For the foregoing reasons, we will affirm the District Court.[5]

---

[4] Ray also argues that the troopers unreasonably believed that Ray was attempting to deliver a controlled substance because they did not hear him agree to a drug deal or check whether he possessed drugs. However, for the reasons stated above, we conclude that the troopers had probable cause to arrest Ray.

[5] Because we conclude the troopers had probable cause to arrest Ray, we need not address his claim that the Government waived its argument that the cocaine evidence obtained after the arrest was found as a result of the driver's consent to a vehicle search. The probable cause to arrest Ray also supported the search of the vehicle. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more."); *see also United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Labron*, 518 U.S. at 940).